AMERICAN FIDELITY CO. v. R. L. GINSBURG SONS' CO.

1. INSURANCE—AGENCY—AUTHORITY—GENERAL AGENTS.
    The general agents of a foreign insurance company who had the management of local business throughout the State, and of the business of local brokers and agents, and who had blank forms of contracts that they were authorized to issue, were not entitled to set limitations upon their general authority contained in instructions from the company to the agents, but not known to the insured, and defendant's claim that it had waived cancellation, denied by the agents, raised an issue of fact for the jury.

2. SAME—CANCELLATION—NOTICE.
    Unless an explicit and unconditional notice of cancellation is given by the insurer, strictly in pursuance of the conditions of the policy, it is not sufficient to terminate the insurer's liability.

3. SAME—FRAUD—APPLICATION—ACCIDENT INDEMNITY.
    Where defendant secured, through general agents in the State, a policy of employer's liability insurance, which,

because of the number of accidents, the agents later notified defendant that they would be compelled to cancel, but that the company might carry the risk if defendant would pay higher premiums, and they would later take up the matter with the insurer, if acceptable to defendant, "or otherwise we are obliged to give notice of 5 days in accordance with the terms of policy numbered," etc., and one of the defendant's officers requested that the subject of an increased rate be taken up with the insurer, and the agents agreed to do so, later advising defendant that the company would continue the policy to its expiration, but when defendant notified them to discontinue it, that it had placed the insurance elsewhere, there was no such cancellation by the insurance company as to avoid the new policy for fraud, defendant representing in its application for the second policy that it had not had any liability insurance canceled within three years.

Error to Wayne; Van Zile, J. Submitted April 6, 1915. (Docket No. 3.) Decided July 23, 1915. Rehearing denied December 22, 1915.

Assumpsit by the American Fidelity Company against the R. L. Ginsburg Sons' Company for money paid out under a policy of indemnity insurance, to protect defendant against litigation. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Oxtoby & Wilkinson,* for appellant.

*Lucking, Helfman, Lucking & Hanlon (A. J. Groesbeck,* of counsel), for appellee.

STEERE, J. The parties to this action are both foreign corporations authorized to transact, and engaged in, business in this State. Defendant is incorporated under the laws of New York, and had been for years engaged in the junk business, dealing in scrap iron, steel, and other metals, having yards for that purpose located at Mt. Elliott avenue and Franklin street, in

the city of Detroit, where it maintains a force of employees. Plaintiff is a Vermont insurance company, with an agency in Detroit, and as a part of its regular business insures employers against liability for accidents to their employees. It on June 28, 1910, first issued defendant a policy of that nature, designated "Manufacturer's Employees' Liability Policy," insuring defendant against liability for accidents to its employees at said yards, which after a time was surrendered and canceled, the premium rate having been increased, and a new policy of like kind, dated September 8, 1910, was issued in its place, which is the one directly involved here.

This policy, as the one preceding it, was issued "in consideration of the premium and the statements set forth in the application" for it, expressly providing as one of its conditions that:

"No assignment of interest, voluntary or otherwise, and no erasure or change of this policy as originally printed, or waiver of any of its terms, conditions or statements, shall be valid unless indorsed hereon and signed by the president, one of the vice presidents, or one of the secretaries of the company. Notice to or knowledge by any agent or other person shall not be held to effect a waiver of any of the terms, conditions or statements hereof."

Defendant's written application for said insurance, which was attached to and made a part of the policy, contained the following:

"No company has canceled or refused to issue any liability, elevator, or boiler insurance to the insured during the past three years, except as follows: None."

Between August 16, 1910, and October 7, 1911, inclusive, several of defendant's employees suffered accidental injuries, two of which resulted in death. Plaintiff without objection assumed the burden of adjusting, or litigating, defendant's liabilities by reason

of such accidents, and paying damages when determined, according to the terms of its policy, until July 30, 1911, when learning for the first time, as was claimed, that defendant's application was untruthful, it caused the following letter to be written by its attorney and sent to defendant:

DETROIT, MICH., August 1, 1911.
"R. L. GINSBURG SONS' COMPANY,
   "542 Franklin Street,
      "Detroit, Mich.
*"Dear Sirs:*
   "I write you on behalf of the American Fidelity Company, regarding the manufacturer's liability policy issued to you on June 28, 1910. This policy was issued by the company to you in consideration of certain statements set forth in your application, a copy of which application was a part of the policy. The application sets forth that the insurance applied for was to be based upon certain statement of facts, which statement was made as a warranty. Statement 14: 'No company has canceled or refused to issue any liability, elevator, or boiler insurance to the insured during the past three years, except as follows: None.'

   "Relying upon the correctness of this statement, the company issued this policy to you. We learned yesterday that your liability policy in the London Guarantee & Accident Company, which covered the period from August 4, 1909, noon, to August 4, 1910, noon, was canceled by the London Guarantee & Accident Company on or about June 22, 1910, the cancellation to become effective June 28, 1910.

   "The American Fidelity Company wishes me to notify you that it must stand upon the warranty contained in your application for its policy, and does not therefore consider itself obligated under its policy to furnish the protection otherwise provided for."

On August 9, 1911, two actions for personal injuries of employees were pending against defendant in the Wayne county circuit court, one of which plaintiff was defending and the time for appearance of defendant in the other had arrived.

In conferences over differences foreshadowed by the

above letter and anticipated resulting litigation, it was agreed by the parties hereto and their respective counsel that complications were such as rendered it advisable to co-operate in defense of pending suits against defendant for personal injuries and the adjustment of other claims of like nature which had been made or were expected, and defer litigation between themselves over the policy until those matters were disposed of. Pursuant to such understanding a stipulation was entered into, on August 9, 1911, reciting the differences which had arisen and the pending suits and claims in regard to which it was deemed advisable to work in harmony, and agreeing that, without prejudice to the rights of either party with reference to plaintiff's liability under the policy, those matters as to third parties in which they were mutually interested should be first worked out to a conclusion, along practically the same lines as though no question as to this policy or difference between the parties themselves existed, before this litigation was initiated.

Subsequently stipulations of like nature were made in relation to other claims, there being five in all, which in the course of time were adjusted and finally fully disposed of by the parties working under said stipulations. After all those matters were out of the way, this action in assumpsit was begun by plaintiff on June 20, 1912, to recover money paid by it in connection with such adjustments according to the policy, with interest. Its declaration alleged in proper form the invalidity of the policy, for the reasons stated, the agreements entered into between the parties in relation thereto, and plaintiff's expenditures in that connection. Defendant pleaded the general issue and gave notice of recoupment for moneys which it had paid out, with interest, under those agreements, alleging that said policy was valid, and, therefore, by the agreements, plaintiff was liable to defendant for the advances it

had thus made. The amounts paid by each are not in dispute, and it is conceded that the right of each to recover the amount claimed is contingent upon the validity or invalidity of said policy.

The case was tried before a jury, and resulted in a directed verdict in favor of defendant for the amount claimed under its plea of recoupment. It was shown upon the trial that prior to insuring with plaintiff defendant carried employees' accident insurance with the London Guarantee & Accident Company, Limited, having a policy issued to it on August 4, 1909, for one year, which by its terms the company could cancel on five days' notice to the insured, and which plaintiff claims the London Company refused to continue and canceled under the terms of the policy at or about the time defendant made application for insurance with plaintiff, stating in said application that no company had canceled or refused to issue it liability insurance during the preceding three years.

Defendant contends there was no absolute cancellation by the London Company of its policy, under its terms and within the meaning of the statement in its application to plaintiff for insurance, and also that all which occurred in that connection was well known to and understood by plaintiff's State agent, who solicited the insurance of defendant, prepared the application, and issued the policy in question. It appears, undisputed, that C. B. Erringer, State agent of plaintiff, and located in Detroit, had, during the spring of 1910, solicited business for his company from officials of defendant with whom he was acquainted, having at one time, when acting for another company, written similar insurance for defendant. He testifies that he made several trips up there and talked insurance, telling them he could give them a better rate than they were paying (which was then 45 cents per $100) :

"Because the American Fidelity Company did not

belong to what is called the so-called combine of liability insurance companies. These other companies that were issuing this kind of insurance were in a kind of combination, * * * as I understood it, and represented to my customers. * * * I wanted that business, certainly. I wanted to take it away from the company that had it. * * *"

The circumstances which enabled these efforts to bear fruit are in outline as follows:

The insurance firm of Raymond & Raymond, of Detroit, was the general agent for the London Company, and, on June 22, 1910, Mr. Harper, a special agent in charge of the business of that firm, wrote defendant as follows:

"*Gentlemen*:

"We regret that we find it necessary to retire our policy with your company, which otherwise would expire on August 4, 1910, on account of the numerous accidents which have made our present rate inadequate to the loss we have sustained.

"We find the first aid medical bills alone amounted to considerable money, and the nature of the injuries have caused us to make expensive investigations and settlements. We might say for your information that this agency have the only scrap iron dealers carried by this company anywhere in the United States, as past experience has proven the hazard almost impossible for any company to underwrite with any chance of profit. We find other companies are having the same experience, and while we are advised by our home office to let all risks of this kind alone in the future, we ourselves, as agents, may prevail upon the company to rewrite your risk, provided, however, we are to secure a rate of $1 per $100 of compensation as against a rate of 45 cents which we now secure.

"Should our suggestion as to the increase of rates be acceptable to you, we will thank you to so advise us immediately, whereupon we shall take the matter up with our company, for their approval, or otherwise we are obliged to give notice of 5 days in accordance with the terms and conditions of the policy numbered B-17993, that on and after June 28th, at 12 o'clock

noon, this company will not entertain any claim or claims made under said policy of insurance.

"Awaiting your early advices, should our suggestion meet with your approval, we remain,

"Yours very truly,

"_____,

"General Agents."

On June 22d a Mr. Jacobson, representing defendant, talked with Harper over the telephone in reference to the contents of this letter and an extension of the policy as proposed. Of this conversation Harper testifies:

"The extension that was under discussion in our first talk was thirty days. That is what would be known as a dollar rate; a dollar a hundred. It was my endeavor at the time, if possible, to secure the dollar rate until the expiration of the policy and then persuade the assured to continue with me at a dollar rate, if the company felt that they could make money on the risk. * * * He told me he had been considering the letter which he had sent me, and that they were desirous of having the extension of their present policy, in order to give them time to make other arrangements, and he wanted me to take up with our company immediately the matter, and secure their sanction to an extension. * * * I told him I would take it up with the company immediately by wire, which I did."

Harper thereupon exchanged telegrams with the Chicago office upon the subject. The replies which he received were interpreted by him as authorizing the extension. It is contended by plaintiff that they did not. Neither these telegrams nor the letter from the company directing cancellation of the policy in the first instance, as reported in Harper's letter to defendant, were shown to Jacobson, or any of defendant's representatives, so far as disclosed. Their information on the subject was what the London Company's State agent wrote or told them. Asked why he did not communicate to Jacobson the contents of a telegram from the company, Harper replied:

"Well, because I told him I could take care of him until the expiration of his policy, and that was as far as I went with him."

Following the telephone conversation, on June 27th, Jacobson, in confirmation of it, sent Raymond & Raymond the following letter:

"The London Guarantee & Accident Company,
     "Raymond & Raymond, Agents,
          "Detroit, Mich.
*"Gentlemen:*
     "We have your letter of the 22d inst., and have noted same carefully. In connection with this we have talked to you to-day over the telephone, and have advised you to carry our insurance in accordance with the policy given you, except that we have authorized you to increase the rate from 45 cents to a dollar per hundred for the term of one month from June 28, 1910. Please see that this matter is taken care of, and as soon as we get all matters in shape in connection with further insurance we will be glad to confer with you.
                    "Yours truly,
                    "R. L. GINSBURG SONS' CO.,
                              "C. D. JACOBSON."

On the same day defendant wrote Erringer:

"We are now considering a new liability policy for our institution, and would like to have you advise us just what you can do on the same."

Erringer promptly went after the business and offered a rate of 33 cents per hundred, which was accepted. He was familiar with the situation, and on the 28th went to defendant's place of business, went through the plant, obtained such information as he desired, made pencil memoranda, issued to defendant what he called a "binder," returned to his office, filled out an application and policy upon the regular blanks, and issued the first policy, of June 28th.

Jacobson testifies that he fully informed Erringer of the letter from the London Company's agent, of

June 22d, proposing to terminate their policy, which would be five days from the 23d as he interpreted it, because they considered the rate too low and demanded an increase, of the communication with Harper, and their negotiations in regard to the subject. Erringer denies that anything was said to him at that time in regard to the London Company. This, if material, would, of course, be an issue of fact. Having arranged for insurance with Erringer, Jacobson then had a conversation with Harper over the telephone, informing him, as he claims at Erringer's suggestion, that they had made other arrangements for their insurance and it was not necessary to do anything further. Of this Harper says:

"The morning of the 28th I had a further talk with Jacobson by telephone. He called me up, and I told him I had received instructions from the home office by telegram that I could continue his policy in full force until the expiration of the date, and that that would help them, and it would probably leave us all with a little better feeling, and he said that was not necessary; that he had made other arrangements to place his insurance elsewhere. I asked him with whom he placed it, and he told me with Erringer, of the American Fidelity, so he told me not to do anything further with the matter and I dropped it there. * * * It [the policy] ceased on June 28th, but it was left to the option of R. L. Ginsburg Company whether they wanted it continued to its expiration; that is, we were ready to eliminate our cancellation letter."

He also states:

"We were perfectly willing on that morning to let the policy run on until August 4th. It was Jacobson that gave me directions that I should let it expire on June 28, 1910.

"*Q.* Well, as a matter of fact, Mr. Jacobson discontinued the policy on behalf of R. L. Ginsburg Sons' Company, rather than your office; isn't that true?

"*A.* Yes, sir."

187 Mich.—18.

After his conversation with Jacobson, Harper called Erringer by phone and testifies that he said:

"You are probably aware of the fact that we have carried the R. L. Ginsburg Company, and I, losing the business, as I understand from the assured, to you, I was naturally interested in knowing what rate you secured. He told me it was none of my business. * * * I said possibly he was aware or not aware of the fact we had canceled the R. L. Ginsburg policy by letter, and naturally, losing the business to him when I had a counter proposition up, I wondered what rate he wrote it at."

Of this conversation Erringer says:

"I remember somebody calling me up and wanting to know what we had renewed the business for, stating that they were the London Guarantee & Accident Company and wanting to know what rate we wrote it for. I told them I did not consider that necessary to give them that information. * * *

"Q. Now, referring to counsel's question with regard to the talk that you had with Harper, do I understand you to say that Mr. Harper did not tell you that the London Guarantee policy was canceled?

"A. I don't remember of him saying that, if it was Mr. Harper that I talked to."

Having secured this insurance at 33 cents a hundred, Erringer later demanded a larger rate, as the other company had, to which defendant was obliged to, or did, concede, resulting in the first policy of June 28th being canceled, and the new policy, the one in question here of September 8th, being issued at the rate of $1 a hundred. Erringer filled out a new application and issued this policy, countersigned by him as the former one. No application for either policy was ever signed by defendant, though each policy had, as before stated, a copy of the application attached to and made a part of it. Erringer, as general State agent, was supplied with blank policies stamped with the name of the

president of the company, which he filled out and issued as he obtained business.

Plaintiff's assignments of error cover the propositions that there was an unequivocal cancellation by the London Company of its policy on June 28th; that defendant had no right to vary the statement of facts made as warranties in its application embodied in the policies issued to it by plaintiff, by oral testimony as to Erringer's knowledge that they were untrue, and, such testimony being inadmissible, a verdict should have been directed for plaintiff; that, even if such proof was competent, the question of Erringer's knowledge was one of fact for the jury to decide. It must be conceded in the outset that, if plaintiff has failed to show the statement in the application relative to cancellation is untrue, it cannot recover, and the other points presented need not be considered.

The fraudulent misrepresentation upon which plaintiff relies to avoid this policy is that no company had "canceled or refused to issue any liability, elevator, or boiler insurance to the insured during the past three years," etc. Clearly no company is shown to have refused. On the contrary, plaintiff's testimony shows that the London Company's State agent was proposing to sell defendant liability insurance, but asking a higher rate, giving a notice of cancellation of the previous policy on the ground that the rate was not adequate, coupled with a condition and suggested alternative.

Limit of authority or instructions from the company to Raymond & Raymond, not made known to defendant, cannot govern. It is to be borne in mind that Raymond & Raymond were general State agents of the London Company, as was Erringer of plaintiff. They were intrusted with the general management of the insurance business of their company throughout the State, having charge of local insurance brokers,

solicitors, and agents; they were supplied with blank forms, and could make contracts and issue policies for their company; their powers could be assumed as coextensive with the business intrusted to their care when acting within the scope of their real or apparent authority. *Insurance Co.* v. *Wilkinson,* 13 Wall. (U. S.) 222. The cancellation of this policy is not determined by private instructions received from the company by them, but on the notice which they gave defendants. Such notice, to be effectual, must be according to the provisions of the policy, and must also have been peremptory, explicit, and unconditional. Richards on Insurance (3d Ed.), p. 384.

The so-called letter of cancellation, of June 28th, from the State agents, does not stand this test. Claiming the then rate to be inadequate and regretting the necessity of retiring defendant's policy, the letter proposes a rate deemed adequate and suggests negotiations upon that basis, offering to take the matter up with "our company" if the suggestion is acceptable, "or otherwise" (in case they are not advised it is acceptable) "we are obliged to give notice. * * * Awaiting your early advices, should our suggestion meet with your approval, we remain," etc. "Or" and "otherwise," in the connection used, have substantially the same meaning (suggesting "on the other hand"), and their joint use, strictly speaking, only amounts to emphasizing by redundance the thought conveyed. They serve to so disjunctively co-ordinate the two propositions that each in turn excludes the other, and obscures certainty as to either. That it was not intended by the man who wrote it as final and unconditional is indicated by his statement:

"We were perfectly willing on that morning to let the policy run on until August 4th. It was Jacobson that gave me directions that I should let it expire on June 28th."

This points in the finality to a transaction of surrender by mutual agreement rather than of arbitrary cancellation.

Plaintiff's claim is that a material false representation as to previous insurance rendered its policy to defendant void from the beginning. Upon this proposition it was said long ago, in *Carter* v. *Boehm,* 3 Burr. (Eng.) 1905:

"The question, therefore, must always be, 'whether there was, under all the circumstances at the time the policy was underwritten, a *fair representation,* or a *concealment,* fraudulent, if *designed,* or, though not designed, *varying materially the object* of the policy, and *changing* the *risque* understood to be run.' "

The alleged false representation in this case falls far short of measuring up to those requirements. For the reasons stated, we are unable to conclude that there was an unconditional, distinct, and peremptory notice given defendant of cancellation of the London Company's policy, or that the statement in defendant's application to plaintiff, as written by the latter's State agent, was false and fraudulent.

The judgment is affirmed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.